## In Re Anonymous No. 54 D.B. 83 and 59 D.B. 83

Disciplinary Board Docket nos. 54, 59 D.B. 83.

SCHWARTZMAN, *Member*, April 19, 1985—Pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d)(2)(iii) the Disciplinary Board of the Supreme Court of Pennsylvania submits this report and recommendations to your honorable court respecting the above-captioned petition for discipline.

## I. HISTORY OF THE CASE

This case involves the failure of respondent over a period of time from 1977 through 1983 to timely process lawsuits which he had accepted, and his subsequently lying to his clients as to the status of the cases. In several of the cases, he falsely told the

client that he had filed suit and that the case was in process; that hearings had been scheduled; that hearings had been held; that judgments or settlements had been obtained in favor of the client; and that money would shortly be received in satisfaction of those judgments. In others, he indulged in similar egregious fabrications.

Several of the complained-of actions took place while respondent was employed as a staff attorney by [A] Legal Services, but some occurred while he was in private practice.

It appears that some financial loss was suffered by some of his clients as a result of the resondent's action or inaction.

The issues involved are guilt of the charges specified and the punishment to be imposed. There are no factual issues because respondent stipulated to, and admitted the truth of, all factual allegations contained in the two petitions for discipline.

There are no questions concerning admission of evidence or other procedural matters.

Office of Disciplinary Counsel filed two petitions for discipline, charging violations of the following Rules of the Code of Professional Responsibility:

"(a) Disciplinary Rule 1-102(A)(4) — dealing with a lawyer engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

(b) Disciplinary Rule 1-102(A)(6) — dealing with a lawyer engaging in any other conduct that adversely reflects on his fitness to practice law.

(c) Disciplinary Rule 6-101(A)(3) — dealing with a lawyer neglecting a legal matter entrusted to him.

(d) Disciplinary Rule 7-101(A)(1) — dealing with a lawyer intentionally failing to seek the lawful objectives of his client through reasonably available means.

(e) Disciplinary Rule 7-101(A)(2) — dealing with a lawyer intentionally failing to carry out a contract of employment entered into with a client for professional services."

## II. FINDINGS OF FACT

1. Respondent, [ ], was born in 1946, was admitted to practice law in the Commonwealth of Pennsylvania in 1971, and his law office is located at [ ].

### 54 D.B. 83

### CHARGE I (re [B])

2. On or about April 12, 1978, while employed as a staff attorney by [A] Legal Services, respondent was assigned to represent [B] (hereinafter, [B]) in an action against [B]'s former landlords, [C].

3. On or about June 1, 1978, respondent filed suit against [C], on behalf of [B], with [ ] County District Justice [D].

4. After a hearing on or about June 14, 1978, District Justice [D] decided in favor of [B] and awarded them $313.

5. After [C] timely appealed District Justice [D]'s decision to the [ ] County Court of Common Pleas, on or about July 14, 1978, respondent filed a complaint in assumpsit and replevin against [C] with said court at number [ ] and the complaint was duly served upon [C]'s attorney, [E].

6. After the pleading stage was completed, on or about February 2, 1979 a panel of arbitrators was appointed to hear and decide [B]'s suit.

7. An arbitration hearing was scheduled for June 13, 1979.

8. On or about June 12, 1979, respondent telephoned Attorney [E] and misrepresented to him

the arbitration hearing had to be continued because Mrs. [B]'s grandfather was ill.

9. Thereafter, the arbitration hearing was continued and respondent failed to take any action to have the hearing rescheduled.

10. Between June 13, 1979 and sometime in the fall of 1979, respondent misrepresented to [B] on numerous occasions that an arbitration hearing had been scheduled and postponed, when in fact no such hearing had been scheduled.

11. In January, 1980, respondent mailed [B] a document he had drafted and placed in a blue binding.

(a) The document was a purported agreement between [B] and [C], whereby [C] agreed to pay [B] $313 in settlement of their suit.

(b) In fact, [C] never agreed to pay [B] any money in settlement of their suit.

(c) In fact, respondent never engaged in settlement negotiations with either [C] or their counsel.

12. In a cover letter enclosed with the document, respondent misrepresented to [B] that:

(a) He had negotiated a settlement with [C].

(b) [B] needed only to sign the document to finalize the settlement.

(c) Once they signed the document and mailed it to respondent, [B] would receive $313 from [C] within 30 days.

13. Shortly thereafter, [B] signed the document and mailed it to respondent.

14. When [B] did not receive the $313 within 30 days, Mr. [B] telephoned respondent in about early March, 1980. At that time, respondent misrepresented to Mr. [B] that:

"(a) Because Mrs. [C] had not abided by the settlement agreement, he would file a judgment against her.

(b) After he filed the judgment, he would then execute on the judgment to obtain the $313."

15. Shortly thereafter, respondent misrepresented to Mr. [B] that:

"(a) He had filed a judgment against Mrs. [C].

(b) He had given Mrs. [C] additional time to obtain the $313."

16. Subsequently, in March 1980:

"(a) Respondent told [B] that a sheriff's sale was scheduled for early April, 1980, which was false, as no such sale was ever scheduled.

(b) When Mr. [B] told respondent that he wanted to attend the sheriff's sale, respondent told him he should not attend because he feared that there would be a physical confrontation between Mr. [B] and Mrs. [C].

(c) Mr. [B] then agreed not to attend the sheriff's sale.

(d) Respondent misrepresented to [B] that he would attend the said sheriff's sale and then report to [B]."

17. When Mrs. [B] telephoned respondent in about the middle of April, 1980, respondent misrepresented to her that Mrs. [C] had taken action to have the sheriff's sale postponed until the end of April, 1980.

18. During the first week of May, 1980, respondent telephoned Mrs. [B] and misrepresented to her that:

"(a) The property owned by [C] was sold at a sheriff's sale for about $1,000.

(b) He would forward the money owed to [B] in the near future.

19. Having not received any money from respondent, on or about May 9, 1980, Mrs. [B] telephoned respondent for a status report. During their telephone conversation, respondent misrepresented to her that:

"(a) The sheriff's sale had been held.

(b) The money owned to [B] was at the Courthouse.

(c) Disbursing the money owed to [B] was a "matter of red tape", or words to similar effect.

(d) The money was first given to the sheriff who then gave the money to the county treasurer.

(e) [B] would get the money owed to them from the county treasurer."

20. Mrs. [B] then telephoned the [   ] County Sheriff's Office and was told by an employee in said office that there was no record of a judgment filed against Mrs. [C] or a sheriff's sale against her property.

(a) Mrs. [B] then telephoned respondent and told him of the above conversation with the employee of the sheriff's office.

(b) Respondent then misrepresented to Mrs. [B] that the employee in the sheriff's office was "all wrong", or words to similar effect.

21. Shortly thereafter, in May, 1980, respondent telephoned Mrs. [B] and told her "I'm sorry I've lied to you for the last six months", or words to similar effect.

22. That same day, [B] met with [F], respondent's supervisor at [A] Legal Services and respondent at the [A] Legal Services Office in [   ]. At that meeting, respondent:

(a) Admitted again that he had lied to [B] for the last six months about the progress of the case.

(b) Admitted that when he received the purported settlement agreement between [B] and [C] in the mail from [B], he threw it away.

(c) Offered [B] $300 from his own funds to settle the matter.

(d) Stated he would work for [A] Legal Services until the end of May, 1980, and would then pay [B].

23. [B] rejected respondent's offer.


## CHARGE II (re [G])

25. On or about February 19, 1979, while employed as a staff attorney by [A] Legal Services, respondent was assigned to represent [G] (hereinafter [G]) in a bankruptcy action. At that time:

(a) Respondent told [G] to provide him with all his outstanding bills and information about his debts so respondent could prepare the bankruptcy petition.

(b) Respondent told [G] he would file the petition when [G] paid [A] Legal Services the $50 filing fee.

26. On or about March 6, 1979;

(a) [G] provided respondent with his outstanding bills and information about his debts.

(b) [G] paid [A] Legal Services the $50 filing fee.

27. Thereafter, respondent failed to ever file [G]'s bankruptcy, as he had agreed to do.

28. On or about March 13, 1979, [G] telephoned respondent. During their conversation:

(a) Respondent misrepresented to him that he had filed the bankruptcy petition.

(b) Respondent misrepresented to him that the bankrupcty was "going along okay", or words to similar effect.

29. Thereafter, [G] telephoned respondent about once a week for about a month. During their conversations respondent misrepresented to [G] that the bankruptcy action was "going along okay", or words to similar effect.

30. Sometime in May, 1980, [G] telephoned respondent. During the conversation:

(a) Respondent misrepresented to [G] that his bankruptcy hearing was scheduled for July 17, 1980.

(b) Respondent told him to meet with him at his office on July 15, 1980, to prepare for the bankruptcy hearing.

31. Respondent resigned from employment with [A] Legal Services as of May 31, 1980, but he did not inform [G] of his resignation.

32. Thereafter, [A] Legal Services represented [G] in a bankruptcy action and obtained a discharge of his debts in or about July, 1981.

## CHARGE III (re [H]), now [H])

33. In or about the beginnning of July, 1979, while employed as a staff attorney for [A] Legal Services, respondent was assigned to represent [H] (now [H] and hereinafter [H]) in an action against her former landlords, [I] (hereinafter [I]) and [J] (hereinafter [J]).

(a) On or about June 12, 1979, [H] had filed suit against [I] and [J] with [  ] County District Justice [K] to recover her security deposit.

(b) After a June 26, 1979, hearing, District Justice [K] had decided in favor of [H] and awarded her $311.50, which award was being appealed by [I] and [J].

34. After [I] and [J] had timely appealed to the [  ] County Court of Common Pleas, on or about August 1, 1979, respondent filed a complaint in assumpsit on behalf of [H] at number [  ], which complaint was duly served.

35. After [H] made numerous attempts to contact respondent about the status of her case, respondent told her that an arbitration hearing was scheduled

and he had to meet with her beforehand to "prep" her for the hearing, which were misrepresentations, as no such hearing was ever scheduled.

36. Before the date set for the supposed meeting to "prep" [H], respondent telephoned her and misrepresented to her that the case had been settled, and both [I] and [J] agreed to each pay [H] $145.

37. During a subsequent telephone conversation with [L], [H]'s husband, respondent misrepresented to him that the settlement check would be sent to her by certified mail.

38. When [H] did not receive the settlement check, [L] told respondent he would get the check from [I]'s and [J]'s attorney. At that time:

(a) Respondent misrepresented to [L] that [I] had paid respondent the $145 but that [J] refused to pay.

(b) Respondent advised [L] that [H] should not accepted payment from [I] unless [J] was also willing to pay the $145.

39. Respondent then suggested to [L] that [H] settle her suit with [I] and [J] by agreeing to accept less money from them, which [H] subsequently agreed to do.

40. Shortly thereafter, respondent misrepresented to [H] that [I] and [J] were willing to settle for a lesser amount.

41. When [H] approached respondent for payment, respondent misrepresented to her that [I] and [J] had "backed out", or words to similar effect, and had refused to pay.

42. In or about May, 1980, respondent told [H] he had entered the district justice's judgment as a lien against [I] and [J]'s real estate for the amount of her damages, which was a misrepresentation as no such lien was ever filed.

43. At or about this same time, respondent:

(a) Misrepresented to [H] that a sheriff's sale

would be scheduled to sell [I]'s and [J]'s property to satisfy the judgment.

(b) Misrepresented to [H] that no sheriff's sales were being scheduled until September, 1980, and nothing could be done until then.

(c) Told [H] to contact him at his [A] Legal Service Office sometime in August, 1980, and when respondent so told [H], he knew he had resigned from [A] Legal Service as of May 31, 1980.

44. Thereafter, [A] Legal Services took over representation of [H] and, on October 24, 1980, after hearing, a board of arbitrators awarded [H] $173.50 and she received said amount on or about November 17, 1980.

## CHARGE IV (re [M])

45. In or about August, 1979, while employed as a staff attorney by [A] Legal Services, respondent was assigned to represent [M] (hereinafter [M]), who wanted to sue his former landlord, [N] (hereinafter [N]) to recover compensation for damages he incurred when [N] improperly denied [M] access to his mobile home, which was parked in [N]'s mobile home park, and removed [M]'s personal property from the mobile home and placed it outside.

46. At or about this time:

(a) Respondent told [M] he would file suit against [N] with the [   ] County Court of Common Pleas.

(b) Respondent requested [M] to pay [A] Legal Services for the costs of filing the suit.

47. On or about October 25, 1979, [M] paid [A] Legal Services $32 for the costs of filing the suit.

48. Thereafter, respondent failed to ever file suit on [M]'s behalf, as he agreed to do.

49. Subsequently, on numerous occasions when [M] asked respondent for a status report:

(a) Respondent misrepresented to him that he had, in fact, filed suit against [N].

(b) Respondent misrepresented to him that [N]'s attorney was refusing to agree to a hearing being scheduled.

50. In or about January or February, 1980:

(a) Respondent misrepresented to [M] that [N]'s attorney had offered respondent $1,200 to settle [M]'s suit.

(b) [M] told respondent he refused to accept the offer.

51. A few days later:

(a) [M] told respondent he was willing to accept the offer.

(b) Respondent then told [M] he should wait a week or two to find out if [N] would offer a greater settlement amount.

52. When [M] contacted respondent approximately two weeks later:

(a) Respondent misrepresented to him that respondent was not able to make contact with [N]'s attorney.

(b) Respondent misrepresented to him that [N]'s attorney was not in town.

53. In about March, 1980:

(a) Respondent misrepresented to [M] that a hearing had been scheduled sometime in April, 1980, but that [N]'s attorney had insisted that it be continued.

(b) Respondent misrepresented to [M] that the hearing was rescheduled for July 14, 1980.

(c) Respondent misrepresented to [M] that he should meet with respondent on July 10, 1980, at 2:00 p.m. to prepare for the July 14, hearing.

(d) Respondent told [M] not to contact him before July 10 as nothing could be done until then.

54. Respondent resigned from employment with [A] Legal Services as of May 31, 1980, but he did not inform [M] of his resignation.

55. Subsequently, [A] Legal Services filed suit against the [N] on [M]'s behalf and in early 1983 [M] received $2,500 from [N] in settlement of the suit.

## CHARGE V (re [O])

56. On or about December 15, 1979, while employed as a staff attorney by [A] Legal Services, respondent was assigned to represent [O] (hereinafter [O]) in an action against [O]'s former landlords, [C] (hereinafter, [C]).

(a) [O] and their children rented an apartment from [C] in June, 1979.

(b) [O] wanted to sue [C] for damages arising from a self-help eviction and distraint of their property by [C].

(c) Respondent agreed to file suit against [C] with the [   ] County Court of Common Pleas.

57. Respondent failed to ever file any suit on behalf of [O] against [C].

58. Subsequently:

(a) Respondent misrepresented to [O] that he had filed suit against [C] with the [   ] County Court of Common Pleas.

(b) Respondent misrepresented to [O] that a hearing on the suit had been scheduled for May 27, 1980.

59. Respondent later misrepresented to [O] that he had taken action to have the May 27 hearing continued because [O] failed to meet with him to prepare for the hearing.

60. At or about this time:

(a) Respondent misrepresented to [O] that the attorney for [C] offered $2,500 to settle their suit against [C].

(b) Mr. [O] told respondent he would not accept less than $5,000.

61. In or about late May, 1980, respondent misrepresented to [O] that a hearing was scheduled for July 7, 1980.

62. Respondent resigned from employment with [A] Legal Services effective May 31, 1980, but he did not inform [O] of his resignation.

## CHARGE VI (re [P])

63. On or about December 20, 1979, while employed as a staff attorney for [A] Legal Services, respondent was assigned to represent [P] (hereinafter [P]).

(a) [P] had rented an apartment from [Q] (hereinafter [Q]) paid him a $50 security deposit, and moved some of her personal property into the apartment.

(b) Shortly thereafter, [Q] refused to allow her to rent the apartment and kept her $50 security deposit and sewing machine.

(c) [P] wanted to sue [Q] for the return of her security deposit, for either the return of her sewing machine or its value of about $194, and for her $45 costs in removing her property from the apartment.

64. Respondent agreed to file suit against [Q] on [P]'s behalf with District Justice [D] when [P] paid [A] Legal Services the filing fee of $26.

65. On or about April 18, 1980, [P] paid respondent the filing fee of $26 and said amount was deposited in [A] Legal Services' escrow account.

66. Thereafter, respondent failed to ever file the suit against [Q], on behalf of [P], as he agreed to do.

67. Shortly thereafter, respondent misrepresented to [P] that:

(a) He filed suit against [Q] on [P]'s behalf with District Justice [D].

(b) The hearing was scheduled before District Justice [D] on May 23, 1980 at 10:00 a.m.

68. Shortly before May 23, 1980, [P] telephoned respondent. During their conversation:

(a) [P] told him she could not attend the scheduled hearing her father had recently passed away.

(b) Respondent misrepresented to her that he would contact District Justice [D] and have the hearing rescheduled.

69. Respondent resigned from employment with [A] Legal Services, effective May 31, 1980, but he did not inform [P] of his resignation.

70. During the first week of June, when respondent was no longer employed by [A] Legal Services, respondent telephoned [P]. During their converconversation:

(a) Respondent misrepresented to her that he had contacted District Justice [D] and he had excused [P]'s absence at the scheduled May 23, hearing.

(b) He misrepresented to her that he would take action to reschedule the hearing for sometime in July, 1980.

(c) He misrepresented to her that he would contact her and notify her of the hearing date.

71. Subsequently:

(a) [A] Legal Services filed suit against [Q] on [P]'s behalf with District Justice [D].

(b) An [A] Legal Service attorney represented [P] at an August 25, 1980, hearing.

(c) After the hearing, District Justice [D] awarded her $340.

## 59 D.B. 83
## CHARGE I ([R])

71. On or about December 15, 1981, respondent agreed with Mr. and Mrs. [R] to represent the interests of [S] (an aunt of Mrs. [R]), on a continent fee basis, in a suit against [T] (hereinafter [T]) for fraud in connection with [T]'s appraisal of real estate located at [    ], Pa.

(a) In December, 1977, [T] had appraised the property at $4,500.

(b) In early 1978, the property was sold for about $4,500 by [U], Mrs. [R]'s uncle, who died soon thereafter.

(c) Subsequently, the [R] suspected that [T] was involved in a fraud concerning the sale of the property.

(d) Mrs. [R] then obtained the Power of Attorney of [S], [U]'s widow, to pursue the matter of the alleged fraudulent sale on her behalf.

72. At that time, respondent advised Mr. [R] to hire another appraiser to render another appraisal of the property.

73. On or about April 1, 1982:

(a) Mr. [R] gave respondent the appraisal of [V], who, in March, 1982, appraised the property, as of late 1977, at $12,000.

(b) Mr. [R] told respondent he wanted respondent to sue [T] in regard to the matter, which respondent then specifically agreed to do.

74. Thereafter, however, respondent failed to promptly file suit against [T], and had not done so as of various times at which he implied to [R] that he had done so.

75. In April, May, June, July and August, 1982, Mr. [R] asked respondent about the status of the action against [T], at which times respondent misrep-

resented to Mr. [R] that the case was "going great", or "don't worry, it's all set" or words to similar effect, which was false as respondent had not taken any significant action on the matter.

76. Subsequently, in or about the end of September, 1982, or the beginning of October, 1982, respondent telephoned Mrs. [R] and misrepresented to her that a hearing had been scheduled for October 28, 1982, which was false as no suit had been filed and no hearing had been scheduled.

77. On or about October 26, 1982, respondent telephoned Mrs. [R] and misrepresented to her that the hearing had to be cancelled because one of the witnesses could not attend on that date.

78. On or about October 29, 1982, Mr. [R] was told by an employee of the [    ] County Prothonotary's Office that no such suit had been filed against [T] and no hearings were scheduled concerning the matter.

79. Mr. [R] then discussed the situation with [    ] County Court of Common Pleas Judge [W].

(a) Judge [W] and Mr. [R] met with respondent in the [    ] County Courthouse, at which time Mr. [R] asked respondent why the hearing had been postponed.

(b) Respondent then suggested to Judge [W] that Mr. [R] was confused, as respondent was representing the [R] "in a criminal matter', with reference to the matter involving [T].

80. During December, 1982, and January, 1983, meetings with Mr. [R] at respondent's law office, respondent misrepresented to Mr. [R] that he would get another hearing scheduled, which was false, as no suit had been filed.

81. In the end of March, 1983 respondent telephoned Mr. [R] and misrepresented to him that another hearing had been scheduled.

82. In April, 1983, shortly before the purported hearing date, respondent telephoned Mrs. [R] and misrepresented to her that [T] wanted to settle the matter out-of-court.

(a) At respondent's request, [R] met with respondent at his office.

(b) Respondent then misrepresented to [R] that [T] offered to settle the case for $1,500.

(c) [R] refused to accept the offer.

83. Later that same day, respondent telephoned Mrs. [R]. During their telephone conversation:

(a) Respondent asked Mrs. [R] if she would accept $3,000 from [T] to settle the matter.

(b) Mrs. [R] told respondent she refused to accept $3,000 but she would accept $4,000.

(c) Respondent misrepresented to Mrs. [R] that he would tell [T]'s attorney that she would accept $4,000 to settle the matter.

(d) Respondent told her he would telephone her the next day.

84. The next day, respondent telephoned Mrs. [R]. During their telephone conversation:

(a) Respondent misrepresented to her that [T] agreed to settle the matter for $4,000.

(b) Respondent misrepresented to her that [T] told him he wanted to settle the matter because he did not want his reputation hurt in a court hearing.

85. During the next few weeks in April, 1983, Mrs. [R] made numerous telephone calls to respondent inquiring about when she would receive the $4,000 from [T] and respondent consistently misrepresented to her that [T] had told him the money was "in the mail", or words to similar effect.

86. Subsequently, respondent telephoned Mrs. [R]. During their telephone conversation:

(a) Respondent misrepresented to her that he was having difficulty obtaining the settlement money from [T].

(b) When Mrs. [R] asked respondent what could be done, respondent mispresented to her that he would "take it back to court", or words to similar effect.

87. In or about the beginning of June, 1983, respondent telephoned Mrs. [R] and misrepresented to her that a hearing had been scheduled for June 28, 1983 at 9:30 a.m.

88. On June 27, 1983 at about 9:30 a.m., respondent telephoned Mrs. [R] and misrepresented to her that "the court sessions were behind and your case was delayed until July 7, 1983", or words to similar effect.

89. That same day, that [R] met with respondent at his office. At that time:

(a) The [R] requested that respondent go with them to the [    ] County Courthouse to make sure the hearing had been scheduled as respondent had represented.

(b) Respondent then asked [R], "Don't you think I'm telling the truth?", or words to similar effect.

(c) When Mrs. [R] told respondent that they did not believe him, respondent told [R] he was too busy to go to the courthouse with them.

(d) Respondent then misrepresented to [R] that he would take action "today" to have a hearing scheduled for them.

(e) [R] then discharged respondent from employment.

90. As of that time, respondent had never filed suit against [T], as he had repeatedly falsely misrepresented that he had done.

## CHARGE II ([X])

91. On or about September 3, 1982:

(a) Respondent agreed to represent [X] (hereinafter [X]) in a divorce and related support action for a fee of $245.

(b) [X] paid respondent $50.

(c) Respondent filed a Complaint in Divorce on [X]'s behalf, which included request for alimony pendente lite.

92. On or about November 21, 1982, as per respondent's request, [X] sent respondent a check for $120 to pay for the cost of a master's hearing.

93. In December, 1982, [X] telephoned respondent to inquire about the status of the alimony pendente lite claim.

(a) Respondent told her that he would pursue the matter immediately.

(b) Thereafter, respondent failed to take action to obtain alimony pendente lite for [X].

94. In or about December, 1982, respondent told [X] that the master had been appointed for the divorce action but that no hearing had been scheduled.

95. In February, 1983, [X] wrote to respondent and told him that if he did not schedule a master's hearing, she would file a complaint against him with the Disciplinary Board.

96. Shortly thereafter, on or about February 18, 1983, respondent telephoned [X] and misrepresented to her that a divorce hearing had been scheduled for February 25, 1983 at 2:30 p.m. Such a statement was then false in that:

(a) No such hearing had been scheduled.

(b) Respondent had never contacted the master to schedule a hearing.

97. On or about February 24, 1983, at about 4:15 p.m., respondent telephoned [X]. During their telephone conversation:

(a) Respondent misrepresented to her that the February 25 hearing was postponed because the master had to go out of town.

(b) Respondent misrepresented to [X] he would take action to reschedule the hearing the next day and then telephone her to tell her when the hearing was to be held.

98. Respondent subsequently failed to telephone her and although she telephoned respondent on numerous occasions during the next week, and left messages for him to call her, he failed to return her calls.

99. [X] telephoned respondent on or about March 3, 1983. During their telephone conversation:

(a) Respondent misrepresented to her that he was having lunch with her husband's attorney the next day to try to settle the matter without a hearing, which was false as respondent had not scheduled such a meeting with her husband's attorney and, in fact, had not even contacted him.

(b) Respondent misrepresented to her that he would contact her soon after the meeting.

100. Having not heard from respondent, [X] telephoned respondent on numerous occasions but was unable to speak with him. Despite the fact that she left messages with respondent's secretary to have him call her, he failed to return her calls.

101. [X] then wrote to respondent and requested that he contact her, but he failed to do so.

102. In about the beginning of April, 1983, [X] discharged respondent as her attorney.

## CHARGE III ([X])

103. In or about November 1978, [Y] (hereinafter [Y]) and his wife, [     ], entered into three written contracts with [Z] (hereinafter [Z]) and his wife, [     ], to facilitate the [Y] purchase of real estate and business property of and major ownership in [AA] (hereinafter [AA]).

104. Subsequently, [Z] took action to take back control of [AA] from [Y], took action to have [Y] removed as [AA]'s Chief Operating Officer, and told [Y] of his intent to void the aforementioned contracts.

105. On or about June 17, 1980, [Y] retained respondent to file suit against [Z] for damages he sustained as a result of [Z]'s actions, at which time respondent specifically agreed to file suit against [Z] on [Y]'s behalf.

106. Subsequently, respondent failed to ever file suit against [Z], despite numerous and repeated requests by [Y] that he do so.

107. On January 15, 1981, [Z] and his wife filed suit against [Y] in the United States District Court for [     ] District of Pennsylvania (at C.A. [     ]), claiming that [Y] had breached the aforementioned contracts and on February 5, 1981, respondent filed an answer to the complaint.

108. Shortly thereafter, [Y] requested that respondent file suit against [Z].

(a) Respondent told [Z] "not to worry about it" as he would "take care of it right away", or words to similar effect.

(b) However, respondent failed to file suit against [Z].

109. In April, 1981, [Y] were deposed regarding [Z]'s suit and at that time, [Y] again requested that respondent file suit against [Z], and take action to depose [Z].

(a) Respondent told [Y] he would file suit against [Z] and take action to depose [Z].

(b) However, resondent failed to do so.

110. In July, 1981, [Y] told respondent that [Z] was harrassing him and wasting the assets of [AA].

(a) Again, [Y] requested that respondent file suit against [Z].

(b) Respondent told [Y] that "certain preliminary hearings were taking place" and he would "soon settle the matter', or words to similar effect.

(c) [Y] requested that respondent inform him as to when hearings were scheduled as to the [Z] suit, so he could appear and defend himself.

(d) Respondent told [Y] he would keep him informed and notify him when to appear at hearings.

111. In August, 1981, [Y] again requested that respondent file suit against [Z] and inform him as to when hearings were scheduled.

(a) Respondent told [Y] he would rather sue [Z] in Common Pleas Court, as opposed to Federal Court.

(b) [Y] suggested to respondent that they might be foreclosed from filing suit in Common Pleas Court, once the federal matter was decided.

(c) Respondent denied that they would be so foreclosed from filing suit in common pleas court, and promised to take action immediately.

112. On August 12, 1981, a hearing was held before Judge [BB] regarding [Z]'s and [Y]'s motions for summary judgment in the federal suit.

113. After arguments by counsel, Judge [BB] issued an August 12, 1981, memorandum and order. Therein, Judge [BB]:

(a) Ruled that [Y] was in breach as to the contracts.

(b) Stated that once [Z] provided [Y] with adequate notice of default, a writ of possession could be

issued and served by the United States Marshall for the real estate occupied by [Y].

(c) Stated that [Z] could currently cancel the stock sold to [Y] and issue new stock to himself and his wife.

114. Respondent had failed to notify [Y] in advance of the August 12, 1981, hearing, and did not advise him of the results of the hearing.

115. Shortly thereafter, the United States Marshall served respondent and [Y] with notice of the default, which was the first information [Y] had of the hearing or its outcome.

116. Subsequently, on or about October 8, 1981, [Y] was served with a writ of possession, which notified him to vacate certain of the real estate he occupied under the contracts with [Z].

117. Respondent filed a motion for stay of proceedings on October 21, 1981, but the motion was denied by Judge [BB], as a result of which, the [Y] were forced to vacate certain real estate they occupied.

118. Shortly thereafter, [Y] again requested that respondent file suit against [Z] and inform him as to when the next hearing was scheduled.

(a) Respondent told [Y] he would file suit "right away", or words to similar effect.

(b) However, respondent failed to do so.

119. On November 16, 1981, a non-jury trial as to damages to be awarded to [Z] was scheduled before Judge [BB]. Prior thereto:

(a) Respondent entered into an agreement with [Z] whereby judgment was entered against [Y] in the amount of $13,234.32, the amount of damages claimed by [Z].

(b) Respondent entered into the agreement with [Z] without [Y]'s knowledge or consent.

120. Respondent failed to notify [Y] of the scheduling of the hearing, of the agreement with [Z], or of the judgment being entered.

121. On or about December 7, 1981, respondent filed a notice of appeal with the United States Court of Appeals for the Third Circuit.

122. On or about December 11, 1981, a United States Marshall served [Y] with notice that the judgment had been entered, and of [Z]'s intention to depose [Y] as to assets that might be subject to execution by [Y].

123. When [Y] contacted respondent about the notice, respondent then told him that he should not worry as "we'll go to a higher court" in hopes of getting a "friendlier judge."

124. In January, 1982, [Y] again requested that respondent file suit against [Z].

(a) Respondent assured [Z] that he would file suit against [Z] within ten days.

(b) Respondent failed to file suit against [Z], as he had then promised promptly to do, and never did so thereafter.

125. Thereafter, on numerous occasions, [Y] asked respondent about the status of the suit and each time, respondent told him that he was working on the suit.

126. On or about April 20, 1982, respondent told [Y] that the suit would be filed within one week, but it was not.

127. On numerous occasions in June, 1982, when [Y] asked respondent about his suit against [Z], respondent misrepresented to him that he had, in fact, filed suit with the [   ] County Prothonotary.

(a) In late June, 1982, respondent sent [Y] a document entitled complaint in assumpsit, which he misrepresented as having been filed.

(b) Respondent further misrepresented to [Y] that the prothonotary could not find a record of the suit because the same docket number had been assigned to two different cases.

(c) In fact, respondent never filed the suit.

128. On or about June 29, 1982, [Y] met with attorney [CC] (hereinafter [CC]) to discuss his prospective suit against [Z].

(a) [Y] told [CC] he thought respondent did not file suit against [Z].

(b) [CC] agreed to file a praecipe on [Y]'s behalf if suit had not been filed.

129. [CC] then telephoned respondent. During their telephone conservation, respondent misrepresented to him that:

(a) He had filed suit against [Z] on [Y]'s behalf.

(b) He had mailed a copy of the filed complaint to [Y].

130. [CC] then learned from the [ ] County Prothonotary's Office that no suit had been filed against [Z] on [Y]'s behalf.

131. [CC] filed a praecipe on [Y]'s behalf the next day, to toll the running of the statute of limitations.

132. Sometime between late 1981 and July, 1982, respondent entered into an agreement with [Z] whereby the $13,234.32 judgment against the [Y] was reduced to $10,000 plus interest and the right of the [Y] to file an appeal was waived, which agreement respondent made without [Y]'s knowledge or consent.

133. By letter dated July 20, 1982, [Y] discharged respondent as his attorney.

## III. DISCUSSION

Respondent is 37 years of age and received his JD from the University of [   ] in 1970. He was admitted to the Supreme Court of Pennsylvania on March 22, 1971. He has only one dependent, his wife, who is employed as a legal secretary.

He was honorably discharged as a Captain from the United States Air Force after five years of service. In December, 1976, he went to work for the [A] Legal Services and left there in May, 1980.

Respondent admitted all of the allegations of the various charges and gave as his excuse his statement that he was simply overwhelmed by the amount of work which he was expected to perform.

While this board can sympathize and identify with an attorney who is "buried" in work and can understand the desperation which ensues from such a situation, we can neither understand nor condone the falsehoods and the actions to which respondent reverted. There is simply no excuse for telling clients that their cases had been heard and that judgments had been obtained. Likewise, it is difficult to understand how an attorney can stipulate to a default judgment, as respondent did in the [Y] matter.

It appears that respondent has little regard for the truth when he is looking for a way out of a difficult situation. The reports given by respondent to his clients were bizarre and in the realm of fantasy.

A striking example of his carelessness with the truth is his request that the original hearing be continued because of the hospitalization of his wife. The chairman of the hearing committee, suspecting that this was a false excuse, granted the continuance on condition that respondent provide written proof that his wife had indeed been hospitalized, as

he had represented. Not only was the written proof not presented, but respondent persisted during the hearing in the falsehood by representing, for example, that he had placed the written material in the mail.

At oral argument before a panel of this board, respondent admitted that these assertions were untrue.

It is likewise disconcerting that respondent flatly stated to the hearing committee that he could not guarantee that the same type of thing might not happen again.

Respondent indicated that he realizes his problem, and he is now attempting to avoid the conditions which caused those problems. He is no longer working for the [A] Legal Services, and the private law firm by which he is presently employed is gradually becoming selective in the type of work and the caseload which it accepts. The hearing committee stated, "while unconvinced of the credibility of respondent, [we are] nevertheless favorably impressed by his candor, even though there seemed to be a masochistic element in it."

Respondent stated to the oral argument panel that he is presently receiving psychological counseling to help him overcome his problem.

As far as specific charges and punishment are concerned, the hearing committee found:

"The committee thinks, and therefore finds, that respondent violated D.R. 1-102(a)(4), and 1-102(A)(6). While it is true that, technically, respondent was guilty of violation of D.R. 6-101(A)(3), it is the opinion of the committee that the dishonesty, fraud, deceit and misrepresentation practiced by respondent include and swallow up 6-101(A)(3). The committee does not find respondent guilty of violation of D.R. 7-101(A)(1) and 7-

101(A)(2). We do not feel he intentionally accepted and neglected his clients' cases but rather, because of overwhelming pressure, failed to process them and then committed the fraudulent acts which the committee feels to be the most egregious features of his misconduct.

The committee is aware of the informal admonitions previously imposed in this matter and is of the opinion that it is obvious that something stronger will be necessary to salvage the career and profession of this errant lawyer and protect the public.

The committee believes that the humiliation of public censure by the Supreme Court will present the recurrence of further violation by respondent. It does not believe that suspension or disbarment is called for in this matter, primarily because in some cases, the client has suffered no loss as a result of the action of respondent and, in other cases, respondent has offered to make financial restitution and thus, make the client whole. The committee is certain that respondent understands that any future violations will result in the loss of his right to practice his profession.

Because the committee is of the opinion that respondent comprehends the precariousness of his situation and because the committee feels that the suggested punishment will be prophylactic, it is the unanimous recommendation of the committee that there be imposed upon respondent public censure by the Supreme Court. The committee cannot see the practicality of probation in a situation such as this, and therefore, does not recommend probation."

This board agrees with the findings of the hearing committee with regard to the specific violations of the rules. However, we cannot go along with the recommended punishment. It is the opinion of this board that respondent be suspended from the practice of law for a period of one year.

## IV. CONCLUSIONS OF LAW

Respondent violated:

(a) Disciplinary Rule 1-102(A)(4) — dealing with conduct involving dishonesty, fraud, deceit or misrepresentation.

(b) Disciplinary Rule 1-101(A)(6) — dealing with conduct that adversely reflects on a lawyer's fitness to practice law.

(c) Disciplinary Rule 6-101(A)(3) — dealing with a lawyer neglecting a legal matter entrusted to him.

## V. RECOMMENDATIONS

The Disciplinary Board of the Supreme Court of Pennsylvania recommends to your honorable court that respondent be suspended from practice of law for one year and that he be ordered to pay the costs associated with investigating and processing the petition for discipline.

## ORDER

NIX, *C.J.*, And now, this June 14, 1985, upon consideration of the recommendation of the Disciplinary Board dated April 19, 1985, it is ordered that [respondent] be and he is suspended from the Bar of the Commonwealth for a period of two years, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice McDermott and Mr. Justice Zappala would accept the Disciplinary Board's recommendation of a one-year suspension.

Mr. Justice Papadakos would issue a rule to show cause why respondent should not be disbarred.